UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

LAWRENCE FOGARAZZO and
CAROLYN FOGARAZZO, Joint
Tenants With Rights of Survivorship,
STEPHEN L. HOPKINS, and DON
ENGEL on behalf of themselves, and all
others similarly situated,

**Plaintiffs,**

- against -

LEHMAN BROTHERS, INC.,
GOLDMAN SACHS & CO., and
MORGAN STANLEY & CO., INC.,

**Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**03 Civ. 5194 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/4/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.    INTRODUCTION**

Plaintiffs, a class of investors who bought shares of RSL
Communications, Inc. ("RSL"), allege that defendants, three investment banks,
fraudulently issued materially misleading analyst reports that artificially inflated
the price of RSL stock. Plaintiffs now move for class certification. For the
following reasons, their motion is granted.

1

## II.   BACKGROUND

### A.   Facts

Plaintiffs bring this securities fraud claim pursuant to Section 10(b) of the Securities Exchange Act against Lehman Brothers,[1] Morgan Stanley, and Goldman Sachs, alleging that defendants issued false and misleading analyst reports on RSL during the class period in order to "win or maintain lucrative banking and financial advisory work from the Company."[2]  As a result of defendants' misconduct, plaintiffs allege that the market price of RSL common stock was artificially inflated, injuring plaintiffs and other class members who purchased RSL stock based on the integrity of its market price.[3]

### B.   Procedural History

On July 27, 2005, I certified a class including "all persons who purchased or otherwise acquired shares of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates inclusive" after finding that

---

[1]   On September 19, 2008, Lehman Brothers Inc. commenced bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York.  Although the proceedings against Lehman Brothers are automatically stayed, the claims against the other two defendants may proceed.

[2]   Amended Complaint ("Am. Compl.") ¶ 2.

[3]   See id. ¶ 3.

plaintiffs had made "some showing" that the requirements of Rule 23 were met.[4]
Pursuant to Federal Rule of Civil Procedure 23(f), defendants appealed this Order.

On January 26, 2007, the Second Circuit vacated the Court's class certification order and remanded the action for reconsideration in light of its decision in *In re Initial Public Offering Securities Litigation*, which clarified the standards for class certification.[5]  On July 2, 2007, this Court issued a stay pending the outcome of the Second Circuit's decision in *In re Salomon Analyst Metromedia Litigation*.[6]  On September 30, 2008, the Second Circuit issued its opinion in *Metromedia*, holding that the *Basic v. Levinson* fraud on the market presumption extends to allegations of securities fraud against research analysts.[7] The Court subsequently lifted the stay, and plaintiffs have filed a renewed motion for class certification.

## III.   LEGAL STANDARD

---

[4]      *See Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176 (S.D.N.Y. 2005) ("*Fogarazzo I*").

[5]      *See* 471 F.3d 24 (2d Cir. 2006).

[6]      *See* 7/2/07 Memo Endorsement.

[7]      *Metromedia*, 544 F.3d 474, 481 (2d Cir. 2008).  In *Basic v. Levinson*, the Supreme Court held that an investor may avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient. 485 U.S. 224 (1988).

### A.     Class Certification

#### 1.     Requirements of Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure governs class certification.  "'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'"[8]  To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy.[9]

The numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable."[10]  Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a

---

[8]     *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting *Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989)).

[9]     *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).

[10]     Fed. R. Civ. P. 23(a)(1).

4

class action the most efficient method to resolve plaintiffs' claims.[11]  Sufficient

numerosity can be presumed at a level of forty members or more.[12]

Commonality requires a showing that common issues of fact or law

affect all class members.[13]  "Commonality does not mandate that all class members

make identical claims and arguments."[14]  When "common questions do

predominate, differences among the questions raised by individual members will

not defeat commonality."[15]

---

[11]    *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007).  *See also Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) ("'[I]mpracticality' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class.").

[12]    *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 *Newberg On Class Actions* § 3.05 (2d ed. 1985)).

[13]    *See* Fed. R. Civ. P. 23(a)(2).

[14]    *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (citing *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 153-54 (2d Cir. 1983)).

[15]    *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996).  *Accord Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (citing *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)); 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d ed. 2008) ("To the extent that 'co-extensive' suggests that the representatives' claims must be substantially identical to those of the absent class members, it is too demanding a standard.").

"Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[16] Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where "injuries derive from a unitary course of conduct by a single system."[17]  A lack of typicality may be found in cases where the named plaintiff "was not harmed by the [conduct] he alleges to have injured the class"[18] or the named plaintiffs' claim is subject to "specific factual defenses" atypical of the class.[19]

Adequacy demands that "the representative parties will fairly and adequately protect the interests of the class."[20] "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic

---

[16]     *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[17]     *Marisol A.*, 126 F.3d at 377.

[18]     *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006). *Accord Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002) (finding an absence of typicality where the "named claimants had not suffered 'injur[ies] similar to the injuries suffered by the other class members'" (quoting *McClain v. South Carolina Nat'l Bank*, 105 F.3d 898, 903 (4th Cir. 1997)).

[19]     *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006).

[20]     Fed. R. Civ. P. 23(a)(4).

6

to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[21]  "[C]lass representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"[22]  However, the Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance."[23]

Finally, the courts have added an "implied requirement of ascertainability" to the express requirements of Rule 23(a).[24]  "[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine

---

[21]  *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

[22]  *Id.* at 61 (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)).

[23]  *Id.* (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966)).  *Accord Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 344 (S.D.N.Y. 2004) (holding that inflexible application of the adequacy requirement "runs counter to a principal objective of the class action mechanism – to facilitate recovery for those least able to pursue an individual action").

[24]  *In re IPO Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006).

whether a particular individual is a member."[25]  "'An identifiable class exists if its members can be ascertained by reference to objective criteria.'"[26]

### 2.    Requirements of Rule 23(b)

In addition to showing that the proposed class satisfies the four prerequisites of Rule 23(a), plaintiffs must show that the class is "maintainable" under Rule 23(b).  A class satisfies this requirement if it fits into one of the three alternative categories delineated by Rule 23(b), subdivisions (1), (2), and (3).  In the case at bar, plaintiffs move for class certification pursuant to subdivision (b)(3).

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and the court finds that class litigation "is superior to other available methods for the fair and efficient adjudication of the

---

[25]      7A Wright, Miller, & Kane, *supra*, § 1760.  *Accord In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983)).

[26]      *In re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)). *Accord id.* at 396 ("The Court also must be able to determine the class' membership "'without having to answer numerous fact-intensive inquiries.'" (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001))).

8

controversy."[27]  Generally, the "'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"[28]  The Second Circuit has observed that this subdivision

> encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.[29]

"Regardless of whether [an action] as a whole satisfies Rule 23(b)(3)'s predominance requirement," courts may employ Rule 23(c)(4) to certify a class on a particular issue.[30]

Under Rule 23(b)(3), a court must also determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."[31]  In determining whether the class action

---

[27]     Fed. R. Civ. P. 23(b)(3).

[28]     *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)).

[29]     *Id.* (quotations and citation omitted).

[30]     *Id.* at 227.  Rule 23(c)(4)(A) provides that "[w]hen appropriate . . . an action may be brought or maintained as a class action with respect to particular issues . . . ."

[31]     Fed. R. Civ. P. 23(b)(3).

mechanism is the most "fair and efficient" method of resolving a case, courts must consider the following four nonexclusive factors: (1) class members' interest in maintaining individual actions; (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the difficulties likely to be encountered in the management of a class action."[32]

### 3.    Rule 23(g)

"[A] court that certifies a class must appoint class counsel."[33]  In doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) counsel's knowledge of the applicable law;" and

---

[32]    *In re Nassau County*, 461 F.3d at 230 (citing Fed. R. Civ. P. 23(b)(3)) (quotation marks omitted).

[33]    Fed. R. Civ. P. 23(g)(1).

(4) "the resources that counsel will commit to representing the class."[34]  "The court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[35]

### 3.    Standard of Review

Plaintiffs bear the burden of demonstrating – by a preponderance of the evidence – that the proposed class meets the requirements for class certification.[36] This Court must "'assess all of the relevant evidence admitted at the class certification stage' when determining whether to grant a Rule 23 motion."[37]  "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement."[38]  However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[39]

---

[34]    Fed. R. Civ. P. 23(g)(1)(A).

[35]    Fed. R. Civ. P. 23(g)(1)(B).

[36]    *See Teamsters*, 546 F.3d at 202.

[37]    *Id.* (quoting *In re IPO*, 471 F.3d at 42).

[38]    *In re IPO*, 471 F.3d at 41.

[39]    *Id.*

### 4.    Expert Testimony

In *Visa Check*, the Second Circuit held that "a district court may not weigh conflicting expert evidence or engage in 'statistical dueling' of experts."[40] The Court's role was merely to "ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law."[41]  However, in *In re IPO*, the Second Circuit disavowed that holding, explaining instead that "[a] district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit."[42]

### B.    Securities Fraud

To state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."[43]  Transaction causation requires a plaintiff to demonstrate that "'but for the claimed

---

[40]    *Visa Check*, 280 F.3d at 135 (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999)).

[41]    *Id.*

[42]    *In re IPO*, 471 F.3d at 41.

[43]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[44]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[45]  "To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."[46]

### 1.    The Fraud on the Market Presumption

In *Basic v. Levinson*, the Supreme Court determined that an investor may invoke a rebuttable presumption of reliance in cases of misrepresentations. The Court held that an investor may avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[47] The Court observed that "the market . . . ideally, transmits information to the investor in the processed form of a market price.  Thus the market is performing a substantial part of the valuation process . . . ."[48]  The Court noted that Congress

---

[44]     *Id.* (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005)).

[45]     *ATSI*, 493 F.3d at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[46]     *ATSI*, 493 F.3d at 107 (citing *Lentell*, 396 F.3d at 173).

[47]     485 U.S. at 227.

[48]     *Id.* at 244.

expressly relied on the efficient capital markets hypothesis: "'The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [sic] about a situation where the market price reflects as nearly as possible a just price.'"[49] Thus, "[b]ecause most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[50]

The Supreme Court thus permitted plaintiffs who demonstrate an efficient market to benefit from two presumptions: "(1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value."[51] Defendants can rebut such a presumption by demonstrating that the market price was not affected by the misrepresentations, possibly by showing that market makers knew the truth or that the concealed information "credibly entered the market and dissipated the effects of the misstatements . . . ."[52]

[49]     *Id.* at 246 (quoting H.R. Rep. No. 1383, at 11).

[50]     *Id.* at 247.

[51]     *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004) (citing *Basic*, 485 U.S. at 245-47).

[52]     *Basic*, 485 U.S. at 248-49.

14

In *Metromedia*, the Second Circuit held that "there was no reason in law or logic to apply a bright-line rule prohibiting the application of the *Basic* presumption in suits against secondary actors such as research analysts."[53]  The Circuit reasoned that "the premise of *Basic* is that, in an efficient market, share prices reflect 'all publicly available information, and, hence, *any* material misrepresentations.'"[54]  Thus, the court concluded, "[i]t does not matter, for purposes of establishing entitlement to the presumption, whether the misinformation was transmitted by an issuer, an analyst, or anyone else."[55]

The court also reinforced the intentions of the *Basic* Court with respect to the burden of proof.  It noted that the *Basic* Court had "'expressly adopt[ed] the *TSC Industries* [*v. Northway, Inc.*,] standard of materiality for the [section] 10(b) and Rule 10b-5 context' that 'to fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available."[56]  Thus, so long as the "plaintiffs can

---

[53]     544 F.3d at 482.

[54]     *Id.* at 481 (quoting *Basic*, 485 U.S. at 246) (emphasis added).

[55]     *Id.*

[56]     *Id.* at 482 (quoting *Basic*, 485 U.S. at 231-32) (internal quotations omitted).

show that the alleged misrepresentation was material and publicly transmitted into a well-developed market, then reliance will be presumed . . . ."[57] "Plaintiffs therefore do not bear the burden of showing an impact on price."[58] "Rather, the burden of showing that there was no price impact is properly placed on defendants at the rebuttal stage."[59] "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[60] The Supreme Court has noted that one way to "sever the link" is to demonstrate that the alleged misrepresentations were immaterial, by showing that they did not lead to a distortion in price.[61]

In *Metromedia*, the Circuit further held that a "definitive assessment" that the Rule 23(b)(3) predominance requirement is met "cannot be made without determining whether defendants can successfully rebut the fraud-on-the-market

---

[57]     *Id.* at 483.

[58]     *Id.*

[59]     *Id.*

[60]     *Basic*, 485 U.S. at 248.

[61]     *See id.*

16

presumption."[62] Thus, the Circuit ruled that "a court must permit defendants to present their rebuttal arguments before certifying a class."[63] Noting that this determination may overlap with the merits of the case, the Circuit added that "the district court will be 'accorded considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements' in order '[t]o avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation . . . .'"[64]

### 2.   The *Affiliated Ute* Presumption

The Supreme Court has also held that a presumption of reliance may apply in cases in which plaintiffs have alleged that defendants failed to disclose information. In *Affiliated Ute Citizens of the State of Utah v. United States*, the Court held that where a plaintiff's fraud claims are based on omissions, transaction causation may be satisfied so long as the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material.[65]

---

[62]     *Metromedia*, 544 F.3d at 485 (citations omitted).

[63]     *Id.*

[64]     *Id.* (quoting *In re IPO*, 471 F.3d at 41).

[65]     *See* 406 U.S. 128, 154 (1972).

17

Facts are material if "a reasonable investor might have considered them important in the making of [a] decision."[66]

This presumption is nevertheless not conclusive.[67] "Once the plaintiff establishes the materiality of the omission . . . the burden shifts to the defendant to establish . . . that the plaintiff did not rely on the omission in making the investment decision."[68] To satisfy this burden, a defendant must prove "that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.'"[69]

## IV.    DISCUSSION

### A.    Rule 23(a)

Defendants do not dispute that plaintiffs have demonstrated all four Rule 23(a) requirements.  Nevertheless, I have determined that plaintiffs have met these requirements by the preponderance of the evidence.

---

[66]    *Id.* at 153-54.

[67]    *See DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987).

[68]    *Id.* at 76.

[69]    *Id.* at 78 (quoting *Rochez Bros. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)).

Plaintiffs assert that "there are many hundreds, if not thousands, of geographically dispersed members of the proposed Class."[70] Indeed, as this is a securities fraud case, the plaintiff class will certainly number more than forty.[71] As such, numerosity is presumed.[72]

Plaintiffs have similarly demonstrated by the preponderance of the evidence satisfaction of the commonality requirement. This action involves the publication of materially false and misleading information about RSL in analyst reports and the concurrent failure by defendants to disclose improper arrangements between research analysts and investment bankers whereby research analysts would help investment bankers to obtain business from clients by disseminating misleadingly positive analyst reports about those clients in exchange for compensation ("*quid pro quo* arrangements").

Common questions of law and fact include whether defendants engaged in acts and conduct in violation of federal securities laws; whether they issued false and misleading statements in their analysts' reports; whether these

---

[70]  Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification ("Pl. Mem.") at 7.

[71]  *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999).

[72]  *See Consolidated Rail Corp.*, 47 F.3d at 483.

reports were issued in order to secure investment banking business with RSL;

whether market prices of RSL common stock were artificially inflated due to the

material omissions and  misrepresentations identified in the Complaint; whether

plaintiffs relied on the omissions and misrepresentations; and whether the

members of the Class sustained damages.

Plaintiffs have also demonstrated by the preponderance of the

evidence satisfaction of the typicality and adequacy of representation

requirements.  The claims of proposed class representatives Lawrence Fogarazzo,

Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel arise from the same event

or course of misconduct as other class members and are based on the same legal

theory.  In addition, there are no conflicts of interests between the proposed class

representatives and other putative class members, and no unique defenses apply

only to the proposed class representatives.  Finally, the proposed class

representatives have actively litigated this case for six years, and through their

counsel, have engaged in motion practice and discovery.

I similarly find plaintiffs' counsel to be "qualified, experienced and

able to conduct the litigation."[73]  The Law Offices of Curtis V. Trinko, LLP

("Trinko") has more than thirty years of experience in class action and derivative

---

[73]     *Baffa*, 222 F.3d at 60 (citing *In re Drexel*, 960 F.2d at 291).

securities litigation.[74] Curtis Trinko, the principal of the firm and one of the lead attorneys on this case, has been significantly involved in over 350 complex litigations.[75] Moreover, Trinko has vigorously represented the interests of the class throughout the last six years of this litigation. Accordingly, I find that Trinko satisfies the requirements of Rule 23(g) and appoint the firm as class counsel.

I am further convinced that the class is ascertainable using objective criteria. The class includes all purchasers of RSL common stock within a certain time period. Plaintiffs note that putative class members can be readily identified from "RSL's books and records, as well as records maintained by the applicable transfer agents."[76] Plaintiffs have therefore demonstrated by the preponderance of the evidence that the class is ascertainable.

**B.    Rule 23(b)**

**1.    Predominance**

---

[74]    *See* Law Offices of Curtis V. Trinko, LLP website, *available at* http://www.trinko.com/CVT.html.

[75]    *See id.*

[76]    Pl. Mem. at 12.

As in *Fogarazzo I*, defendants principally challenge plaintiffs' motion

for class certification on the ground that plaintiffs cannot satisfy the predominance

requirement of Rule 23(b). *First*, defendants contend that plaintiffs have failed to

establish transaction causation on a class-wide basis.[77] *Second*, defendants argue

that plaintiffs have failed to demonstrate that loss causation can be proven on a

common basis.[78] I will discuss each of these topics in turn, as well as address

whether there is an adequate formula by which to calculate damages.

### a.    Transaction Causation

Plaintiffs seek to rely on two presumptions to demonstrate reliance:

(1) the fraud on the market presumption; and (2) the *Affiliated Ute* presumption.[79]

Defendants contest the applicability of both presumptions to this case.[80]

### i.    The Fraud on the Market Presumption

Defendants argue principally that plaintiffs have failed to demonstrate

by the preponderance of the evidence the materiality of the alleged

---

[77]    *See* Memorandum of Law of Defendants Goldman, Sachs & Co. and
Morgan Stanley & Co. Inc. in Opposition to Plaintiffs' Renewed Motion for Class
Certification ("Def. Mem.") at 6-13.

[78]    *See id.* at 13-20.

[79]    *See* Pl. Mem. at 14.

[80]    *See* Def. Mem. at 6-13.

misrepresentations in the analyst reports.[81] They note that "the most offered by

Plaintiffs' expert, Dr. Irvine, is that sometimes analyst reports move stock prices

and that RSL's stock price moved on days when certain analyst reports were

issued" and that Irvine's report "does not come close to satisfying Plaintiffs'

burden to demonstrate by a preponderance of the evidence the materiality of the

challenged analyst reports."[82] However, the burden is not on plaintiffs to make a

showing of price impact. Plaintiffs need only demonstrate that material

misrepresentations were publicly disseminated and that RSL shares traded in an

efficient market.[83]

---

[81]    *See id.* at 7.

[82]    *Id.* at 8.

[83]    *See Metromedia*, 544 F.3d at 481. Defendants do not appear to
dispute that the analyst reports were publicly disseminated or that RSL shares
traded in an efficient market. In any case, there is no doubt that the reports were
published. With respect to market efficiency, the Second Circuit has yet to
delineate factors by which a court may assess market efficiency. However, I note
that courts, including this Court, have examined market efficiency according to the
factors set out in *Cammer v. Bloom.* 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).
Although Irvine did not comment on the individual factors in *Cammer*, a number
of the *Cammer* factors favor efficiency here: RSL was traded on a national market,
RSL shares were traded at high volumes during the class period, RSL was the
subject of a number of analyst reports during the class period, many of which are
the focus of this action, and RSL prices responded to corporate events. I therefore
find that plaintiffs have demonstrated by the preponderance of the evidence that
the analyst reports were made public and that RSL shares traded in an efficient
market.

Plaintiffs proffered the expert report of Dr. Paul J. Irvine in support of their contention that the analyst reports complained of in this action contained material statements.[84]  Irvine is an associate professor at the Terry College of Business at the University of Georgia.[85]  His research focuses on the "influence of investment banks and similar financial intermediaries on securities markets; with a particular concentration on the economics of analysts' activities."[86]

In his report, Irvine noted that numerous empirical studies in the past two decades have confirmed the "broadly accepted principle" that analyst reports issued by reputable brokerage firms "tend to cause substantial impacts on stock transaction prices."[87]  Irvine further concluded that there is not a significant difference between price reactions to assessments in analyst reports as opposed to news of corporate events.[88]

Irvine's conclusions are consistent with the Court's analysis of the materiality of the information contained in the analyst reports at issue.  Research

---

[84]   *See* 11/8/04 Expert Report of Dr. Paul J. Irvine ("Irvine Rep.").

[85]   *See* 4/28/09 Certification of Dr. Paul J. Irvine at 1.

[86]   Irvine Rep. at 4.

[87]   *Id.* at 5-6.

[88]   *See id.* at 7.

24

analysts become experts in a particular industry; their job is to collect information about the companies that comprise that industry and develop recommendations to investors based on that information.[89] Analyst reports will often include a variety of information, including historical and projected financials, news of corporate events, and purchase recommendations or rankings.[90] In addition, analyst reports also contain a stock price target, which is the analysts' prediction of the market price of that company's stock at some time in the future.[91] According to the Complaint, the analyst reports that are at issue in this case repeatedly recommended the purchase of RSL stock notwithstanding the fact that analysts were not, in reality, as optimistic about RSL's prospects as the recommendations they made in reports.[92] Analyst recommendations to purchase RSL stock while RSL's financials were deteriorating could be expected to significantly alter the

---

[89]    *See* Am. Compl. ¶ 24.

[90]    *See id.* ¶¶ 26, 92, 164.

[91]    *See id.* ¶ 28.

[92]    *See, e.g., id.* ¶¶ 78 (alleging that on September 7, 1999, Lehman Brothers analysts issued a Buy rating and evaluated RSL's break-up value as almost twice its trading value because of RSL's Delta 3 IPO when the analysts actually thought little about Delta 3's long-term prospects); 158 (alleging that in March 2000, Goldman Sachs maintained "bullish" reports on RSL despite concerns about RSL's prospective earnings), 208 (alleging that an October 15, 2008 Morgan Stanley report reiterated a Strong Buy recommendation even though RSL had reported a massive $32 million restructuring charge three days earlier).

total mix of information available to investors.  The content of these reports was therefore certainly material.

Although unnecessary, Irvine also conducted an analysis of the market reaction to the analyst reports that are the subject of this action.  By utilizing a three-day cumulative abnormal return methodology,[93] Irvine concluded that significant price responses surrounded the release of the analyst reports at issue, indicating that the market relied on the recommendations of these analysts.[94]

The Court therefore finds that plaintiffs are entitled to the fraud on the market presumption.  It is defendants' burden to rebut the presumption by a preponderance of the evidence by demonstrating that RSL did not experience any price impact as a result of the publication of analyst reports.

---

[93]     As I explained in *Fogarazzo I*, "[t]he 'cumulative abnormal return' is the amount by which the subject security's return differed from the return of the market benchmark over the event window.  For example, if, on the day of an event, the stock price of RSL opened at $10 and closed at $20, while the S&P 500 Composite Index opened at $10 and closed at $15, a 100% abnormal return is associated with the event." 232 F.R.D. at 189.

[94]     *See* Irvine Rep. at 47 (noting that on September 23, 1999, after Goldman Sachs published a report about RSL and recommended the stock as a "buy," RSL repsonded with a cumulative return of 16.1% and that on March 28, 2000, when Morgan Stanley issued a "Strong Buy" recommendation, the stock responded with a 13.5% cumulative return).

Defendants submitted the expert report of Dr. John W. Peavy III to show that none of the fifteen Goldman Sachs or Morgan Stanley analyst reports on RSL complained of in this action had a material impact on RSL's stock price.[95] Peavy is the Chairman and Chief Executive Officer of Peavy Financial Services, a financial consulting firm.[96]  He is also a Professor of Professional Practices in Finance at the M.J. Neeley School of Business at Texas Christian University.[97]

Peavy conducted an analysis of RSL stock price movement on the fifteen days on which Goldman Sachs or Morgan Stanley issued analyst reports.[98] *First*, Peavy determined that RSL's stock movements were abnormally volatile compared to other stocks.[99]  He noted that so long as the stock moved within the bounds of +/- 13.79% on a given day, the stock could be considered to have "moved within the bounds of 'normal' volatility for the stock."[100]  *Second*, he found that thirteen reports were associated with statistically insignificant company

---

[95]     *See* 6/15/09 Expert Report of Dr. John W. Peavy III ("Peavy Rep."), Ex. A to Declaration of Stephanie G. Wheeler, counsel for Goldman Sachs.

[96]     *See id.* ¶ 1.

[97]     *See id.*

[98]     *See id.* ¶ 9.

[99]     *See id.* ¶ 25.

[100]    *Id.*

stock price movements.[101]   Although the remaining two reports caused statistically

significant stock price movements, Peavy noted that one report was a *negative*

report that led to an *increase* in price, while the other negative report was released

to the public *after* RSL's stock price had already declined.[102]   As a result, Peavy

concluded that none of the fifteen analyst reports contained material

information.[103]

Peavy further argued that Irvine's methodology was flawed.  *First*, he

asserted that Irvine's use of a three-day period was inappropriate because

including stock price movements on the day before and the day after the analyst

report was published tended to add "extraneous stock price movements to the

relatively few events."[104]   Peavy observed that where the timing of discrete events

was ascertainable, only the stock price movement on the particular trading day

should matter.[105]   *Second*, Peavy contended that Irvine's cumulative return analysis

failed to show that any price movements were statistically significant.  Peavy

---

[101]   *See id.* ¶ 24.

[102]   *See id.* ¶ 27.

[103]   *See id.* ¶¶ 24, 26.

[104]   *Id.* ¶ 47.

[105]   *See id.*

28

noted that "[w]ithout determining whether the movements in RSL's stock price were statistically significant, [] Irvine cannot draw any conclusions about whether the movements in RSL's stock price were in reaction to the alleged Goldman [Sachs] and Morgan [Stanley] analyst reports or were simply the result of random chance."[106]

Irvine submitted a reply report that responded to Peavy's challenges and questioned Peavy's statistical significance determinations.[107] *First*, Irvine argued that the use of the three-day window did not produce erroneous results. Irvine observed that it was often wise to include the day after the event day in the window where a continuation of price impact may be expected – for instance as a result of a report being issued late in the day, a mis-classification of the date, or simply momentum trading by investors.[108] He added that the day before the event day may also be significant where – as in this case – the information is released first to a select group of investors prior to being released to the public.[109] In any

---

[106]     *Id.* ¶ 49.

[107]     *See* 7/9/09 Reply Expert Report of Dr. Paul J. Irvine ("Irvine Reply"), Ex. A to 7/9/09 Reply Declaration of Curtis V. Trinko, plaintiffs' counsel.

[108]     *See id.* at 4.

[109]     *See id.* Irvine calls analyst reports "quasi-private information" because reports are initially issued to analysts' institutional client base before they are released to the market. *See* Irvine Rep. at 18-19.

29

case, he noted that a three-day event window generated more conservative results by reducing their statistical significance.[110] In other words, use of a three-day window normally reported less statistical significance than basing the results only on price movements that occured on the event day.[111]

*Second*, with respect to Peavy's criticism that Irvine failed to conduct a statistical significance analysis, Irvine responded that such test was unnecessary.[112] He noted that the "double-digit price impacts [he] found (13.5% to 26.7%) were too substantial to be economically insignificant or to have been solely caused by the types of ordinary financial news that were released about RSL during the Class Period."[113]

Nevertheless, Irvine conducted an analysis to determine whether there were statistically significant price movements on days on which analyst reports were published.[114] Using a control period consisting of one hundred days prior to the class period, he determined that "[a]t conventional statistical significance

---

[110]   *See* Irvine Reply at 4.

[111]   *See id.* at 4 n.1.

[112]   *See id.* at 2.

[113]   *Id.*

[114]   *See id.* at 8-9.

levels (5%), a [three]-day abnormal return would have to be greater than 13.3% or less than -13.3% to be statistically significant."[115] He also calculated that a one-day abnormal return would have to be greater than 7.7% or less than -7.7% to be statistically significant for RSL stock.[116] He therefore concluded that abnormal returns larger than these values will have t-statistics larger than 1.98 or smaller than -1.98.[117] Turning to the analyst reports at issue here, he confirmed that in each case, the t-statistic is either greater than 1.98 or less than -1.98, indicating that the abnormal returns are, indeed, statistically significant.[118]

Peavy criticized Irvine's statistical significance analysis because it compared price movements during each event period to the average volatility over a control period consisting of the one hundred trading days prior to the class

---

[115]   *Id.* at 9.

[116]   *See id.*

[117]   *See id.* at 9. "The t-statistic indicates standard deviations. The 'standard deviation' is a number that quantifies the degree to which disparities spread out above and below the mean of distribution, thus describing the probability that chance is responsible for any difference between an expected outcome and the observed outcome in a sample consisting of two groups (a binomial distribution). The greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the expected and observed results." *Griffin v. Board of Regents of Regency Univs.*, 795 F.2d 1281, 1291 (7th Cir. 1986).

[118]   *See id.* at 10.

period.[119]  Peavy asserted that only a control period consisting of class period

trading days, excluding analyst report days, was appropriate to test the statistical

significance on stock price changes due to analyst reports.[120]  Peavy noted that the

volatility during the class period was twice the volatility during the one hundred

days prior to the class period, thereby contributing to Irvine's erroneous

conclusion that the analyst reports materially impacted RSL's stock price.[121]

Irvine countered that contrary to Peavy's suggestion that the control

period should not consist of a set of days prior to the class period, the choice of

such control period is recommended by one of the most respected financial

methodology textbooks, *The Econometrics of Financial Markets*.[122]  The authors

of that textbook note that "[t]he most common choice, when feasible, is to use the

---

[119]    *See* Peavy Rep. ¶ 51.  Although Irvine set out the results of his
statistical significance analysis in his reply report, Peavy was able to respond to
Irvine's analysis in his rebuttal report by anticipating that Irvine would conduct
the same analysis that he did in his reply expert report in support of the first class
certification motion.

[120]    *See id.*

[121]    *See id.*  Peavy also criticized Irvine's methodology because it failed to
account for market and industry factors.  *See id.* ¶¶ 42-45.  Because the isolation of
the price effects of defendants' reports goes principally to the ability of plaintiffs
to show loss causation on a class-wide basis, I will discuss this criticism when I
address loss causation.

[122]    *See* Irvine Reply at 8-9 n.4.

period prior to the event window for the estimation window."[123]  In addition,

Irvine warned that Peavy's methodology was "unorthodox" and noted that it

"ha[d] never been used in a well-known peer reviewed study."[124]

The *Basic* court held – and the Circuit in *Metromedia* confirmed –

that defendants bear the burden of rebutting the fraud on the market presumption

by the preponderance of the evidence.[125]  While Peavy contended that his analysis

showed that the analyst reports did not produce any statistically significant stock

price movements and therefore could not have contained material information, the

same analysis by Irvine suggested the opposite.  Any differences in their results

may have been attributable to Irvine's use of a three-day event window or control

period consisting of days prior to the class period, which Irvine convincingly

defended.  Given the strength of Irvine's challenges to Peavy's findings, I

---

[123]    *Id.* (quoting John Y. Campbell, Andrew W. Lo and A. Craig
MacKinlay, *The Econometrics of Financial Markets* 152 (1997)).

[124]    *Id.* Indeed, one problem of using a control period consisting of class
period days is that price movements on those days may be particularly volatile
*because* of defendants' conduct.  For instance, it may be that there were times
when RSL would issue news of dwindling earnings, therefore causing the stock to
drop initially until one of the defendants would publish a positive analyst report,
which would cause the stock to rise again.

[125]    *See Basic*, 485 U.S. at 248-49; *Metromedia*, 544 F.3d at 483 (noting
that under *Basic*, "the burden of showing that there was no price impact is properly
placed on defendants at the rebuttal stage").

conclude that defendants have failed to rebut the fraud on the market presumption by the preponderance of the evidence on the basis that the analyst reports at issue lacked material information.  Plaintiffs may therefore benefit from the fraud on the market presumption to establish transaction causation.

### ii.    *Affiliated Ute* **Presumption**

Defendants also challenge the applicability of the *Affiliated Ute* presumption in this case, arguing that the Second Circuit has made clear – since *Fogarazzo I* – that only cases involving "'primarily' omission claims" can benefit from the *Affiliated Ute* presumption.[126]  However, the case upon which defendants rely, *Starr v. Georgeson Shareholder, Inc.*,[127] is inapposite.  There, the Second Circuit found that plaintiff had failed to adequately allege the *materiality* of the omissions.[128]  The Circuit also noted in a footnote that the claims did not primarily involve omissions because the omissions only "exacerbated the misleading nature of the affirmative statements . . . ."[129]  By contrast, plaintiffs in this action are alleging claims based on the omissions themselves.  They are claiming that

---

[126]    *See* Def. Mem. at 12.

[127]    412 F.3d 103 (2d Cir. 2005).

[128]    *See id.* at 109.

[129]    *Id.* at 109 n.5.

defendants' failure to disclose the *quid pro quo* arrangements between investment

bankers and research analysts made the analyst reports themselves misleading.

Defendants' argument therefore fails.[130]

Certainly, a reasonable investor would likely rely less on an analyst

report if that investor knew it was tainted by conflicts of interest as a result of

research analysts' *quid pro quo* arrangements with investment bankers.  Because I

find that these omissions were material, plaintiffs are permitted to rely on the

*Affiliated Ute* presumption.

### b.   Loss Causation

Defendants also dispute plaintiffs' ability to prove loss causation on a

class-wide basis.[131]  Defendants note that although Irvine has proposed "an event

study that *could* be used to show that loss causation can be demonstrated by class-

wide proof, he does not actually perform such an event study."[132]  Indeed,

defendants contend that in the absence of Irvine's performance of an event study

---

[130]     I also note that defendants took this issue up on appeal, and the
Second Circuit specifically rejected defendants' argument that this Court had
erroneously applied the *Affiliated Ute* presumption in this case.  *See* 12/22/05
Order, Ex. G to Trinko Reply Decl.

[131]     *See* Def. Mem. at 13.

[132]     *Id.* at 14 (emphasis in original).

in this case, plaintiffs have failed not only to demonstrate that defendants' analyst reports inflated RSL's stock price, but have also failed to show a statistically significant stock price drop when analyst reports began issuing negative recommendations with respect to RSL.[133]  However, defendants misconstrue plaintiffs' burden at the class certification stage.  Plaintiffs need not show definitively that they will be able to demonstrate loss causation; rather, they must demonstrate that the element of loss causation may be proven class-wide, which may be shown by proposing a suitable methodology.

In *Fogarazzo I*, I determined that Irvine's cumulative abnormal returns analysis was a "satisfactory methodology for determining loss causation on a common basis."[134]  Using his three-day event window, Irvine showed that there were marked price responses to analysts' recommendations for RSL – both when analysts released positive reports, and when analysts subsequently downgraded their assessment of RSL.[135]  For instance, he noted that on March 28, 2000, Morgan Stanley issued a Strong Buy recommendation which led to a 13.5%

---

[133]    *See id.* at 14-17.

[134]    232 F.R.D. at 190.

[135]    *See* Irvine Rep. at 47.

abnormal return.[136]  On October 6, 2000, Morgan Stanley downgraded the stock to

a Hold recommendation, and RSL's stock responded with a -22.23% return.[137]

Irvine came to the same conclusions with respect to Goldman Sachs' analyst

reports.[138]  Irvine's reply report also shows that the cumulative returns are

statistically significant.[139]

---

[136]  *See id.*

[137]  *See id.* at 47.  Defendants contend that this price drop could not have
been caused by the Morgan Stanley report because it was published at 9:57 a.m.,
after RSL's stock price had already declined.  *See* Def. Mem. at 17.  However,
Irvine notes that analyst reports are typically released to selected clients prior to
public dissemination.  *See* Irvine Reply at 10 n.5.  He further notes that "by the
time an analyst report is released broadly to the market much of the price effect
has already occurred."  *Id.* (citing Sok Tae Kim, Ji-Chai Lin, and Myron B. Slovin,
*Market Structure, Informed Trading and Analysts' Recommendations*, 32 J. Fin.
Quantitative Analysis 507-24 (1997)).

[138]  *See* Irvine Rep. at 47.  Irvine noted that Goldman Sachs issued a
"Strong Buy" analyst report on September 23, 1999, which caused RSL stock to
respond with a cumulative return of 16.1%.  *See id.*  On July 12, 2000, the
investment bank downgraded its recommendation from a "Strong Buy" to
"Outperform," and as a result, the stock responded with a -18.5% abnormal return.
*See id.*

[139]  *See* Irvine Reply at 10.  Peavy noted that Irvine cited an August 7,
2000 Morgan Stanley analyst report that downgraded RSL from a "Strong Buy"
rating to "Outperform" and reduced its price target even though RSL's price
increased on that day.  *See* Peavy Rep. ¶¶ 28-29.  While this may raise doubt as
to the merits of plaintiffs' case, plaintiffs are not required to definitively prove their
case at this stage.

In *Fogarazzo I*, I did not consider Peavy's criticisms of Irvine's
methodology, noting that under Second Circuit law at that time, class certification
was "not the time to wage a battle of the experts."[140]  I now consider Peavy's
challenges and undertake a more comprehensive analysis of Irvine's methodology.

Peavy's principal criticism of Irvine's methodology – which he
presented in *Fogarazzo I* and which he emphasized again – is that Irvine failed to
account for confounding events such as market or industry factors.[141]  For
instance, Peavy noted that any study of RSL's price movements as a result of the
analyst reports must account for the price effects of the telecommunications
industry or the market as a whole on RSL's stock.[142]  Because Irvine did not
control for these factors, Peavy argued that Irvine's methodology did not
accurately measure the impact of the alleged analyst reports on RSL's stock
price.[143]

---

[140]     *Fogarazzo I*, 232 F.R.D. at 190.

[141]     *See* Peavy Rep. ¶ 42.

[142]     *See id.*

[143]     *See id.*

38

However, not all events will have significant price effects.  Irvine noted that "[m]any news items are not economically significant."[144]  Thus, in the absence of any indication by Peavy that economically significant events occurred during the class period, Irvine argued that it was unnecessary for his methodology to account for confounding events.[145]

Nevertheless, Irvine proposed five techniques that would succeed at controlling for these confounding factors.[146]  For instance, one technique called for the categorization of groups of events.[147]  Some groups would include confounding events and the publication of the analyst reports in question.[148]  Some groups would include only confounding events.[149]  A study that compared price

---

[144]     Irvine Reply at 12.

[145]     *See id.*  Irvine noted that Peavy characterized a press release reporting a project by one of RSL's subsidiaries that had entered the operational stage as financially relevant.  *See id.* at 13.  However, Irvine argued that it would be hard to believe that a project – presumably already known to the market – would have caused RSL's stock to rise 26.7%, and further contended that Peavy had failed to provide evidence that such press releases normally have an economically significant effect.  *See id.*

[146]     *See id.* at 13-16.

[147]     *See id.* at 13.

[148]     *See id.*

[149]     *See id.* at 14.

effects with and without confounding events would isolate the effect of analyst reports on stock price movement.[150]  Another technique called for the elimination of all analyst reports that were published on days on which confounding events also occurred.[151]  Irvine noted that removal of all reports that were published on the same day as earnings announcements would still leave a sufficient sample of reports for event study analysis.[152]

Peavy nevertheless responded critically to Irvine's proposals.  He contended that Irvine's techniques for controlling confounding factors have been used in the financial literature "to analyze large samples to form conclusions about average effects."[153]  Peavy asserted that Irvine had provided "no explanation about how these methods can be validly applied to determine the specific impact, if any, of the Goldman and Morgan analyst reports on RSL's stock price."[154]

However, Peavy does not show that the sample of analyst reports is too small, nor does he otherwise demonstrate that the techniques are inappropriate

---

[150]     *See id.*

[151]     *See id.*

[152]     *See id.*

[153]     Peavy Rep. ¶ 63.

[154]     *Id.*

for this case.  Indeed, Peavy appears to approve the most straightforward of these

techniques – removing analyst reports that were issued on days on which

confounding events occurred[155] – and Irvine noted that removal of such reports

will still leave a large enough sample to conduct analysis.[156]

Peavy also argued that Irvine had failed to employ any of these

techniques to isolate confounding factors in order to determine the impact of the

Goldman Sachs and Morgan Stanley reports.[157]  However, successful employment

of a methodology and demonstration that the analyst reports did indeed cause

plaintiffs' loss is unnecessary at the class classification stage.  Plaintiffs need only

---

[155]     *See id.* ¶ 58 ("Dr. Irvine recognizes that, for a valid event study to be
undertaken, one must determine how many of the event days are contemporaneous
with confounding events, and then drop these days from the event study
analysis.").

[156]     *See* Irvine Reply at 14.  Defendants also note the difficulty of
separating the price effects of each defendants' analyst reports. *See* Def. Mem. at
15 ("The fact that Plaintiffs' Complaint alleges that three separate and independent
firms issued fraudulent research on the same issuer underscores the difficulty that
Plaintiffs have to show that each firm's analyst reports artificially inflated RSL's
stock price . . . .").  However, just as Irvine's proposed techniques could be used to
separate the effects of confounding events such as earnings announcements, they
can be used also to isolate the effects of analyst reports issued by other firms.

[157]     *See* Peavy Rep. ¶¶ 59-60.

prove by the preponderance of the evidence that loss causation can be proven on a

class-wide basis.[158]  I find that they have done so here.[159]

---

[158]     I note that in *In re Hydrogen Peroxide Antitrust Litigation*, the Third
Circuit ruled that "[a] party's assurance to the court that it intends or plans to meet
the requirements is insufficient," apparently referring to the fact that plaintiffs'
expert had failed to show that the methods proposed for proving loss causation
would actually work.  552 F.3d 305, 318 (3d Cir. 2008).  However, the Second
Circuit has – to date – not adopted such a requirement.  Courts in this district have
similarly not required actual employment of a methodology. *See, e.g., Lapin v.
Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) (noting that "the
relevant question is only whether Plaintiff's expert's methodology will apply to
the entire class"); *In re Alstom SA Secs. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y.
2008) (failing to even require a methodology, but noting that "[a]t the class
certification stage, plaintiffs need only establish that they may be able to [] prove
loss causation at trial.").  Even if it was the case that successful employment of a
suitable methodology was required, Irvine has conducted a three-day cumulative
abnormal return analysis to demonstrate that analyst reports caused significant
price changes in RSL stock.  Any failure to conduct an analysis that employs one
of the five proposed techniques for controlling confounding factors is not fatal in
light of Irvine's reasoning that no such factors have yet been identified.

[159]     In *Fogarazzo I*, I held that plaintiffs could not benefit from the Event
Study Approach put forth by the plaintiffs in *In re IPO*, reasoning that this case
involved misrepresentations and omissions, while *IPO* involved market
manipulation.  232 F.R.D. at 189.  I concluded that "a valid loss causation
methodology in this case must be able to analyze the inflationary effects of the
alleged misrepresentations or omissions and the alleged corrective events." *Id.*  I
now note that the Event Study Approach was first formulated for cases involving
misrepresentations and corrective disclosures. *See* Irvine Reply at 18 (noting that
the Event Study Approach "includes an assumption that there is a day on which
the alleged fraud or misstatement is revealed to the market to be untrue").
Although I find the three-day cumulative return methodology to be sufficient to
show loss causation, plaintiffs may also employ the Event Study Approach if they
select convergence points that coincide with the dates on which negative reports
were issued.  I also note that the Event Study Approach has been frequently used

### c.    Damages

Although each class member's calculation of damages is an

individualized inquiry, courts have held that so long as a formula for calculating

damages is proposed, "the fact that damages must be calculated on an individual

basis is no impediment to class certification."[160]  The calculation of damages in

this case will not be complex.

Irvine has demonstrated that the publication of analyst reports caused

abnormal returns to RSL's stock price.  He has also shown the ability to isolate the

price effects of the analyst reports from the price effects of confounding events.

Furthermore, he notes that at some point during the class period, research analysts

could no longer justify their positive recommendations and began to issue negative

reports on RSL.[161]  These reports can be considered corrective disclosures.

Although plaintiffs do not put forth a specific formula for calculating

damages, based on the information provided by Irvine regarding the price impact

---

to assess damages in securities litigation and may thus be utilized for that purpose
in this case. *See id.* at 17.

[160]    *Klay v. Humana*, 382 F.3d 1241, 1260-61 (11th Cir. 2004). *Accord Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.").

[161]    *See* Irvine Reply at 17.

of certain analyst reports, a class member's damages can easily be calculated by determining when she purchased and sold shares. For instance, suppose that prior to any research reports, RSL was trading at $10 per share. A positive analyst report is released that causes an increase in RSL's price by 20%, based solely on issuance of that report. An investor thereafter purchases one RSL share for $12. Suppose that at some time later, a negative analyst report is issued, and RSL's stock price subsequently drops to $6. The investor then sells that share, incurring a loss. Damages for that class member could be calculated as the lesser of either the amount of inflation caused by the analyst report ($2) or the investor's actual loss ($6). In this case, because the loss attributable to the analyst report was only $2, that investor would receive $2 in damages. A similar formula could be derived to calculate the damages for investors with other purchase and sale dates. The calculation of individual damages is therefore not an obstacle to class certification.[162]

## 2. Superiority

---

[162] Because I find that plaintiffs will have no trouble proving on a class-wide basis that defendants made materially false statements and omitted material information in their analyst reports and that they possessed the requisite scienter, I do not discuss these elements in detail.

My determination in *Fogarazzo I* – that this case is best suited to proceed as a class action[163] – still applies. The case involves thousands of potential claimants who are asserting claims based on predominantly common issues. Claimants likely have no interest in pursuing their own claims, which may be prohibitively small. Adjudicating individual claims would also be a significant waste of judicial resources. In addition, this litigation has been ongoing since 2003. Class counsel and class representatives have already spent a significant amount of time litigating this case. This Court has also become familiar with the claims in this case, further making it desirable to continue this litigation here. Finally, managing this litigation as a class action will not pose any substantial difficulties for the Court.

## V.   CONCLUSION

For the reasons stated above, plaintiffs' motion for class certification is granted. The class will consist of all purchasers of the common stock of RSL during the period from April 30, 1999 through and including December 29, 2000. Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel are appointed as class representatives. Trinko is appointed as Class Counsel. The

---

[163]   *See* 232 F.R.D. at 190.

45

Clerk of the Court is directed to close this motion (document no. 75). A

conference is scheduled for August 13, 2009 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 4, 2009

46

## - Appearances -

**For Plaintiffs:**

Curtis V. Trinko, Esq.
Wai K. Chan, Esq.
16 West 46th Street
New York, NY 10036
(212) 490-9550

**For Goldman Sachs:**

Gandolfo V. DiBlasi, Esq.
Stephanie G. Wheeler, Esq.
David E. Swarts, Esq.
Sullivan and Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

**For Morgan Stanley:**

Peter D. Doyle, Esq.
Peter A. Bellacosa, Esq.
Lisa V. LeCointe, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

**For Lehman Brothers:**

Sarah L. Cave, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000